UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :        19cr797 (DLC)
 UNITED STATES OF AMERICA,               :
                                         :     OPINION & ORDER
              -v-                        :
                                         :
 CONRAD BAPTIST,                         :
                   Defendant.            :
                                         :
----------------------------------------X

APPEARANCES:

For the United States of America:

Ariel Cohen
U.S. Attorney's Office for the Southern District of New York
26 Federal Plaza
New York, NY 10278

For defendant:

Amy Gallichio
Federal Defenders of New York
52 Duane Street
New York, NY 10007

DENISE COTE, District Judge:

The Government has moved in limine for the admission of certain out-of-court statements by the victim regarding the domestic assaults at issue in the Violation of Supervised Release ("VOSR") specifications. For the following reasons, the motion is granted.

## Background

On July 12, 2019 at 3:25 a.m., officers from the New York City Police Department ("NYPD") responded to a 911 call

reporting a dispute between a male and a female involving a firearm.  On November 8, 2019, Conrad Baptist pleaded guilty to one count of possessing a firearm following a felony conviction in violation of 18 U.S.C. § 922(g)(1).

On March 5, 2020, Baptist was sentenced to an above-Guidelines term of 60 months' imprisonment, followed by three years' supervised release.  His conditions of supervised release required Baptist to, among other things, report to Probation, and refrain from committing any federal, state, or local crimes.

Baptist began his term of supervised release on April 29, 2024.  He was enrolled in mental health and substance abuse treatment.

On December 10, 2024, Baptist's ex-girlfriend filed a police report stating that Mr. Baptist had assaulted and harassed her, and on December 18, Baptist was arrested.  The charges were later dropped due to lack of victim cooperation. In March 2025, another female complained of domestic violence by Baptist, which did not result in charges.  After June 3, 2025, Baptist stopped communicating with Probation.

On October 28, 2025, Probation issued a Violation Report and requested an arrest warrant based on Baptist's absconding. On November 13, Baptist was presented on the specification in

the Violation Report.  Baptist was remanded pending his VOSR Hearing.

On December 2, Probation issued an Amended Violation Report with ten specifications (the "Amended Report").  Most relevant here are Specifications Two through Nine, which concern two alleged domestic violence incidents between Baptist and Victim-1.[1]

Specifications Two and Three arise from an October 6, 2025 incident in which Baptist allegedly punched and kicked Victim-1 (the "October 6 Assault"), thereby committing the state crimes of harassment in the second degree and assault in the third degree.  On the day of the attack, paramedics and NYPD officers responded to a 911 call reporting an assault and interviewed Victim-1 at her mother's apartment.  That interview was captured by the officers' body-worn cameras ("BWC") and memorialized in the Domestic Incident Report ("DIR") that the officers completed during the visit.  Victim-1 informed the officers that her assailant had thrown her "off the bed," and began kicking,

---

[1] Specification One is based on Baptist's absconding since June 3, 2025.  Specification Ten arises from Baptist's arrest by the NYPD on November 3, 2025, during which officers searched his person and discovered 20 ecstasy pills, six vials of crack cocaine, and two small baggies of powder cocaine.  The Government will seek to prove these Specifications through Probation and NYPD officer testimony, as well as drug testing evidence.

punching, and hitting her in the head, abdomen, and legs. Victim-1 was reluctant to identify her assailant and declined to press charges, submit a written statement, or seek an order of protection against him.  When pressed, Victim-1 identified her assailant as Shakeel Johnson, provided his address, and stated that he was born in 1972.  Before leaving, paramedics examined Victim-1's injuries and an NYPD officer took a photograph of the bruising on Victim-1's leg.

Specifications Four through Nine arise from an October 11, 2025 incident in which Baptist allegedly stabbed Victim-1 in her neck with a sharp object (the "October 11 Assault"), thereby committing the state crimes of assault in the third degree, assault in the second degree, attempted assault in the third degree, harassment in the second degree, and criminal possession of a weapon in the fourth degree.  On the day of this attack, NYPD officers responded to a call from New York Presbyterian Hospital reporting a patient presenting with a stab wound to the neck.  According to the DIR prepared by the responding officers, Victim-1 told them that, earlier that evening, she had been "hanging with [her] homeboy" in a car when she saw Baptist. When she got out of the car to get her scooter from the trunk, Baptist came up behind her and stabbed her with a sharp object in the left side of her neck, causing her to bleed.  She

4

provided Baptist's address and date of birth, which matched the address and birth year that she had provided on October 6 in connection with Shakeel Johnson.

The officers then questioned her about the history of violence between her and Baptist.  In addition to noting that he had kicked her four days ago, she stated that Baptist had threatened to kill her or her child, had strangled or choked her, was capable of killing her or her child, was violently and constantly jealous of her, and had become more physically violent over the preceding six months.  By contrast, when asked the same questions about her assailant on October 6, Victim-1 had only disclosed that her assailant had previously strangled or choked her.

While at the hospital, Victim-1 received treatment for her stab wound, as well her injuries from the October 6 Assault. Victim-1's medical records from this visit include photos of her wounds, as well as statements regarding the cause of her injuries, including that she was stabbed by her "ex-boyfriend earlier [that] evening" and "physically assaulted by the same person three days ago."

The next day, a domestic violence officer from the NYPD visited Victim-1, who was again staying at her mother's apartment.  The officer's BWC captured that interview.  Victim-1

told the officer that she had known Baptist since January 2025, and that he had "always been abusive."  She explained that initially "it started off with him just giving me a slap or just pushing me to the ground and little by little it would escalate to him like punching me out and kicking me or stuff like that." She then explained that "four days ago, [Baptist] beat me bad, real bad" and admitted that she had given the NYPD a different name in connection with the October 6 Assault because she was "scared."  Regarding the October 11 Assault, Vicitm-1 explained that "yesterday, I was hanging out with my homebody [sic] in a car.  And we stopped in front of the store.  And [Baptist] ended up coming by with a scooter and there was a little back and forth, and when I went to go open the trunk, he just hit me from the back."  Victim-1 told the officer that she wanted to press charges against Baptist and identified his photograph.

The Bronx District Attorney's Office (the "Bronx DA") charged Baptist in connection with the October 6 and 11 Assaults.  When state prosecutors met with Victim-1 in November 2025, however, she stated that she was afraid of Baptist and facing retaliation if she cooperated in his prosecution. Following that meeting, Victim-1 ceased communication with the Bronx DA and ignored three grand jury subpoenas, resulting in the charges against Baptist being dropped on May 4, 2026.

The Government also made unsuccessful attempts to contact Victim-1 by telephone and by visiting two addresses where the Government believed that she was residing, including her mother's apartment.  Meanwhile, the Government produced discovery to the defendant concerning the October 6 and 11 Assaults, which includes, among other things, photographs of Victim-1's injuries from both assaults, Victim-1's medical records relating to the October 11 Assault, BWC footage capturing Victim-1's statements to NYPD officers describing the assaults, and the DIRs relating to the assaults.

On April 9, 2026, Baptist was presented on the new specifications in the Amended Report and entered a denial as to all.  The VOSR Hearing on the ten specifications is scheduled for July 2.

On April 27, the Government moved in limine to admit Victim-1's out-of-court statements regarding the assaults contained in the BWC, DIRs, and medical records, which include her statements identifying Baptist as the perpetrator.  The Government represented that, given the Government's inability to ascertain Victim-1's whereabouts, "it is unlikely that Victim-1 will be available to testify at the Hearing."  Baptist, through counsel, opposed the motion on May 15, outlining concerns about Victim-1's motives and credibility given her own history of

violent conduct and conflicting statements to law enforcement. The Government filed its reply on May 29.  In connection with its reply, the Government provided the Court with the BWC footage from October 6 and 12, DIRs dated October 6 and 11, Victim-1's medical records from October 11, and an excerpt of video surveillance from a March 27, 2025 incident described in Baptist's opposition.  Baptist was granted leave to file a sur-reply, which he did on June 8.

On June 9, an Order directed the Government to contact Victim-1's defense counsel of record in her state court criminal cases to ascertain Victim-1's willingness to testify in these proceedings.  On June 15, the Government informed the Court that Victim-1's counsel had advised the Government that Victim-1 is unwilling to testify at the July 2 Hearing because she is "concerned for her safety should the defendant be released from custody."

## Discussion

A revocation hearing is "not deemed part of a criminal prosecution," United States v. Carthen, 681 F.3d 94, 99 (2d Cir. 2012), and thus "[n]either the Federal Rules of Evidence nor the Sixth Amendment's Confrontation Clause apply with full force." United States v. Diaz, 986 F.3d 202, 209 (2d Cir. 2021).  This is because revocation proceedings "must be 'flexible enough to

consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial.'" Id. (citing Morrissey v. Brewer, 408 U.S. 471, 489 (1972)). Consequently, "[t]he protections that do apply spring instead from the Fifth Amendment's Due Process Clause and Federal Rule of Criminal Procedure 32.1." Id.

Under Rule 32.1, Fed. R. Crim. P., the defendant in a revocation proceeding is entitled to "an opportunity to . . . question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C). When the Government seeks admission of a hearsay statement that does not fall within one of the established hearsay exceptions, Rule 32.1(b)(2)(C) and the Due Process Clause "require[] the court to determine whether good cause exists to deny the defendant the opportunity to confront the adverse witness." United States v. Williams, 443 F.3d 35, 45 (2d Cir. 2006). The Government argues that Victim-1's out-of-court statements regarding the October 6 and 11 Assaults are admissible for good cause.

The good cause determination underlying Rule 32.1(b)(2)(C)'s interest-of-justice analysis is made by balancing, "on the one hand, the defendant's interest in confronting the declarant, against, on the other hand, the

9

government's reasons for not producing the witness and the reliability of the proffered hearsay." United States v. Peguero, 34 F.4th 143, 154 (2d Cir. 2022) (citation omitted). The Second Circuit has recognized that an "expressed desire not to testify [is] not an unusual reaction by a victim of domestic abuse," and that good cause can justify a declarant's absence when the defendant's "history of violent conduct . . . makes reprisal against the declarant a possibility." Carthen, 681 F.3d at 101 (citation omitted).

Baptist has a strong interest in confronting Victim-1. While there is no dispute that Victim-1 was assaulted and injured on October 6 and 11, Victim-1's statements to law enforcement and medical professionals are the only evidence establishing Baptist as the assailant.

Baptist emphasizes that cross-examination of Victim-1 is particularly important because she initially identified another individual as the perpetrator of the October 6 Assault, and she has her own history of violence.  Victim-1 has been arrested three times this year -- on January 26 for allegedly stabbing a woman in the stomach with a knife, on February 26 for allegedly punching and hitting her mother in the head with a water bottle, and on May 15 for allegedly threating her boyfriend with a razor.  Victim-1 has a prior conviction from January 2023 for

10

disorderly behavior, with the original arrest charges including assault and criminal possession of a weapon based on allegations that she struck an elderly man in the head with a cell phone. Victim-1 has also had several orders of protection entered against her.

The record also contains footage of a violent assault on a New York City sidewalk that occurred on March 27, 2025 involving both Baptist and Victim-1.  The video, apparently obtained from a store's security camera, depicts Baptist engaged in a heated argument with an ex-girlfriend, Victim-2, as Victim-1 trails behind them.  After Baptist smacks Victim-2's cellphone out of her hand and corners her against a wall, Victim-1 pushes Baptist away and begins to hit Victim-2, punching her until she falls to the ground.  Victim-1 keeps punching and stomping on Victim-2 until a male bystander intervenes.  Victim-2 lost a tooth and suffered swelling to her face a result of the beating.

Baptist contends that Victim-1's pattern of violence raises the possibility that her injuries resulted from a confrontation that she provoked.  He also argues that, given her own criminal exposure, Victim-1 has a motive to cast herself as a victim instead of a participant in the alleged assaults, thus amplifying the importance of cross examination.

Baptist's strong confrontation interest, however, must be balanced against the Government's reasons for not producing Victim-1 and the reliability of the proffered statements.  On this record, that balance favors admission.

The Government has shown good reason for Victim-1's absence.  Prosecutors from the Bronx DA met with Victim-1 in November 2025 regarding the October 6 and 11 Assaults, and she expressed fear of Baptist and fear of retaliation if she cooperated.  She then ceased communicating with the Bronx DA and ignored three grand jury subpoenas.  The Government also tried, unsuccessfully, to contact her by telephone and at two addresses where it believed she might be found.  The Government was then ordered to contact Victim-1 through her state court defense counsel, who reiterated that Victim-1 is unwilling to testify out of concern for her safety.

The proffered statements also bear strong indicia of reliability for purposes of Rule 32.1(b)(2)(C).  They were made close in time to the events they describe: on October 6, while paramedics and officers responded to Victim-1's mother's apartment; on October 11, while she was being treated at the hospital for a neck wound; and on October 12, the day after the neck injury.  The statements on October 6 and 12 were captured on BWC, and others were contemporaneously memorialized in

12

medical records.  The record also contains photographs corroborating that Victim-1 sustained injuries consistent with the assaults she described.

The principal inconsistency -- her initial use of the name "Shakeel Johnson" to identify the October 6 assailant -- does not defeat admissibility.  As reflected in the BWC footage, Victim-1 was reluctant to cooperate with the officers.  She did not volunteer her assailant's name and only provided one when pressed.  Despite the several opportunities that the responding officers offered to her to make a complaint about the assault, she repeatedly refused to do so.  Then, on October 12, after the stabbing, Victim-1 explained that she initially provided a false name because she was scared.  Moreover, the other identifying information she provided on October 6, including the assailant's address and year of birth, matched Baptist.

Victim-1's own history of violence also does not alter the balance.  That history, while important, does not render her contemporaneous statements unreliable.

Accordingly, although Baptist's confrontation interest is strong, the Government has established good cause under Rule 32.1(b)(2)(C).  The interests of justice therefore do not require Victim-1 to appear as a condition of admitting her

13

statements to the NYPD and medical professionals on October 6, 11, and 12 describing the October 6 and 11 Assaults.

Victim-1's description of the assaults contained in her medical records are also admissible under Rule 803(4), Fed. R. Evid.  This rule explicitly excepts from the prohibition against hearsay any statement that "(A) is made for -- and is reasonably pertinent to -- medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause."  Fed. R. Evid. 803(4).  Under this framework, statements to medical providers concerning the general causation or mechanism of an injury are admissible if reasonably pertinent to medical diagnosis or treatment, while statements assigning specific legal fault ordinarily are not.  See Fed. R. Evid. 803(4) advisory committee's notes on proposed rules.

Immediately following the October 11 Assault, Victim-1 went to the emergency department at New York Presbyterian Hospital, where her stab wound to the neck was treated and closed with staples.  While there, she also reported pain relating to injuries sustained when she was kicked and punched on October 6. Victim-1 was kept for observation overnight and discharged the next morning.

14

Victim-1's medical records from this visit contain statements that she made to medical providers describing her medical history, her past or present symptoms, and their general cause.  As to the cause of her stab wound, she explained that she was "getting out of [the] car when [her] ex boyfriend saw her" and "stabbed her one time to the left neck."  She also provided relevant medical history, including that she "was physically assaulted by the same person three days ago - was kicked and beaten on chest, abdomen, and legs."  Victim-1 received treatment, including imaging of her head, neck, chest, abdomen, and legs, on the basis of these statements.

Baptist challenges only the portions of Victim-1's medical records identifying the perpetrator as her "ex boyfriend" and as "the same person" who assaulted her three days ago, arguing that those statements were irrelevant to Victim-1's medical diagnosis or treatment.  But Victim-1's discharge instructions directed her to contact victim advocacy services and included information for a domestic violence hotline, suggesting that her relationship with the perpetrator was "reasonably pertinent" to the treatment she received.  Fed. R. Evid. 803(4).  In any event, even if those identifying statements do not fall within Rule 803(4), Fed. R. Evid., they are nonetheless admissible for

15

good cause under Rule 32.1(b)(2)(C), Fed. R. Crim. P., for the reasons already explained.

**Conclusion**

The Government's April 27 motion <u>in limine</u> is granted.

Dated:     New York, New York
           June 29, 2026

_____
DENISE COTE
United States District Judge
